**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DEBBIE ISBELL,** ) | |
| ) | |
| **Plaintiff** ) | |
| **v.** ) | **No. 15 C 7333** |
| ) | |
| **BAXTER HEALTHCARE,** ) | **Judge Rebecca R. Pallmeyer** |
| **CORPORATION,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Debbie Isbell worked for Defendant Baxter Healthcare Corporation ("Baxter") from 2007 to 2013; during the end of that time her job involved promoting Baxter's products in other countries. Beginning in 2012, Isbell complained, about, among other things, the tendency of one of her coworkers, Blair Waite, to make comments about an erectile dysfunction drug, including references to the marketing campaign for the drug and a few inappropriate jokes. Isbell's own performance drew criticism from her co-workers, as well. Waite began excluding Isbell from meetings (it is unclear exactly when that started), and in July 2013, Isbell renewed her complaints to Baxter HR and added that she was being retaliated against for her 2012 complaints. Isbell's supervisor, Antoinette Gawin, terminated Isbell in August 2013, after receiving a variety of complaints from Isbell and about her. Isbell brought this action asserting retaliation under 42 U.S.C. § 2000e, *et seq.* for her internal complaints of purported harassment and retaliation. Baxter has moved for summary judgment, which the court grants for the reasons below.

<u>**BACKGROUND**</u>

Baxter, headquartered in Deerfield, Illinois, makes and markets healthcare products. (Def. Baxter's Local Rule 56.1 Statement of Undisputed Material Facts in Supp. of Summ. J.

Mot. ("DSOF") [24] ¶ 1.)  Baxter hired Isbell,[1] who had previous experience in the healthcare industry, in March 2007 as a Group Marketing Manager in its "cellular therapies" business ("CT").  (*Id.* at ¶ 3; Pl.'s Statement of Additional Facts in Resp. to Def. Baxter's Mot. for Summ. J. ("PSOAF") [33] ¶ 1.)  Isbell's responsibilities included, among other things, "conducting market research; . . . working on regulatory issues; working on reimbursement issues; working on a Japan project; creat[ing] contracts; participating in advisory boards; and attending medical meetings." (Pl.'s Resp. to Def. Baxter's Rule 56.1(a) Statement of Undisputed Facts in Supp. of Summ. J. Mot. ("Pl.'s Resp. to DSOF") [38] ¶ 3.)  Isbell had some disputes with her supervisor in the CT group, none of which are relevant here.  (*See id.*at ¶¶ 4–6.)

In November 2011, Isbell transferred into Baxter's Renal Division, where she became a Senior Manager for Market Access.  (DSOF ¶ 9.)  Market Access staff are "responsible for developing tools and products to help [business units for different countries] gain access to the health care system for an existing business[.]"  (Dep. of Bruce Culleton, Ex. D to PSOAF ("Culleton Dep.") [36] 18:22–19:10.)  One of Isbell's primary responsibilities in this role was to create and maintain Baxter's global value dossier ("GVD"), which was "intended to be a repository of information from which all the marketers and people in that function would pull information."  (Dep. of Antoinette Gawin, Ex. A to PSOAF ("Gawin Dep.") [33-1] 82:16–83:1.)  Isbell worked on other projects, as well.  (*See id.*)  When she began working in Market Access, Isbell reported to Gary Inglese, but after Inglese left Baxter at the end of 2012, Isbell began reporting to Antoinette Gawin.  (DSOF ¶¶ 9, 12; *see* Gawin Dep. 4:3–6.)  Before Inglese departed, he wrote Isbell's 2012 performance review.  (Dep. of Deborah Sarason, Ex. F to PSOAF ("Isbell Dep.") [40]–[43] 172:19–174:9.)  Isbell testified that Inglese had told her that her performance exceeded expectations, but when she received the review in early 2013, she found that Baxter rated her as "meets expectations."  (*Id.*)

---

[1]    Plaintiff evidently changed her last name after the lawsuit commenced.  (*See* Isbell Dep. 6:9–7:2.)  For simplicity, the court continues to refer to Plaintiff as Ms. Isbell.

## I.     Isbell's Internal Complaints at Baxter

### A.     2012 Complaints to Inglese

Isbell's complaints centered primarily on Blair Waite, a senior director of new product development at the time Isbell was terminated.  (Dep. of Blair Waite, Ex. E to PSOAF ("Waite Dep.") [37] 13:19–22.)    Before he worked at Baxter, Waite had worked at Eli Lilly Pharmaceuticals, where he helped develop the marketing campaign for the erectile dysfunction drug Cialis.  (DSOF ¶ 52.)  Waite acknowledged that when he worked at Eli Lilly, a coworker had complained about a comment Waite had made about the physiological effects of Cialis, and that Waite received a verbal warning as a result.  (Waite Dep. 69:12–71:5.)

Isbell testified that during meetings, Waite "brought up Cialis and talked about Cialis and what he did and how he launched it and how successful it was and how . . . he can bring that marketing expertise . . . ."  (Isbell Dep. 148:8–16.)  Isbell also described two incidents where Waite and Inglese joked about Cialis and erectile dysfunction in her presence, in December 2011 and March 2012.[2]  (See *id.* at 148:8–151:15.)

Isbell described one incident that occurred in December 2011, when she was in Waite's office with Inglese and Waite.  (*Id.* at 148:22–149:18.)  Inglese and Waite spoke about Cialis and made "innuendos, like bantering back and forth about like, hey, you know, I might need some of that.  Oh yeah.  Oh yeah, I do too, and, it just, you know, it just was inappropriate."  (*Id.*)  According to Isbell, Inglese said "I need some of that," while Waite responded "oh, yeah, yeah, I bet you do."  (*Id.* at 149:19–23.)  Isbell recalled that these comments went on for "maybe a minute."  (*Id.* at 149:24–150:4.)  On another occasion, in March 2012, Isbell was again in Waite's office with Waite and Inglese, "talk[ing] about work streams and strategies for market

---

[2]     Isbell characterizes the Cialis comments as "regularly talk[ing] about erectile dysfunctions those meetings [sic], including 'I need some of that' and related comments."  (Pl.'s Resp. to DSOF ¶ 53.)  Isbell mischaracterizes her own testimony.  The above quotations show that Waite did indeed "regularly" talk about Cialis, but the "regular" discussions were in the marketing context, while Isbell described the "I need some of that" and related comments only on the two occasions mentioned.

access and where that fit into marketing work streams." (*Id.* at 150:5–19.) Inglese again mentioned Cialis, and the same kind of banter went on, again for about a minute. (*Id.* at 150:20–151:8.)

Isbell has identified only two occasions in which Waite joked about Cialis, though she testified that Waite did continue to discuss Cialis in meetings. Isbell felt this was inappropriate, because it was repetitive, it "had nothing to do with what we were working on," and she "didn't really want to think about erectile dysfunction in [her] day-to-day work environment." (*Id.* at 151:9–24.) Isbell does not explicitly say how many people were at these general meetings where Waite described his successful marketing efforts for Cialis, but she testified "if he did it once and said what a great marketer he was to the team of 40 people, that would have been sufficient, but it kept being brought up again and again and again." (*Id.* at 152:1–11.) Waite denies that he made sexual jokes about Cialis at work, but acknowledged he may have done so outside of work. (Waite Dep. 43:8–44:18.) He admitted that he may have made what Isbell called "nonsexual" Cialis jokes in meetings; Waite's example was that in a marketing meeting he might have said "hey, I've gone this far [in this meeting] and I haven't made a single marketing reference to Cialis." (*Id.* at 44:19–45:18.)

Isbell also complained that Waite kept "all this Cialis sales paraphernalia all over the place" in his office. (Isbell Dep. 145:11–22.) Specifically, there were six or seven items: five-inch long bathtubs bearing the Cialis logo (presumably an homage to the television ads depicting side-by-side bathtubs), and some Cialis brochures. (*Id.* at 146:15–147:9.) Isbell acknowledged that none of the Cialis promotional materials displayed genitalia, but she was uncomfortable seeing them in a professional situation (*id.* at 147:10–22); she stated that she looks away when she sees Cialis commercials on television. (*Id.* at 147:23–148:2.)

Isbell testified that Waite did other things that made her uncomfortable—on one occasion, he "walked by [her] cubicle, stepped in, whispered in [her] ear, [']you're paranoid.[']" (*Id.* at 145:2–8.) Sometime in 2012, Isbell told Inglese about this incident and added that she

was "very uncomfortable going into [Waite's] office because there's all this Cialis paraphernalia all over the place, and . . . [she had] to listen to, you know, the chatter about, you know, joking around about erectile dysfunction or alluding to it." (*Id.* at 145:2–24.) Isbell recalls that the Cialis marketing materials "went away about a week [after she talked to Inglese]" (*id.* at 159:3–15), though Waite denies being told that Isbell had complained about him to Inglese. (Aff. of Blair Waite, Ex. I to DSOF [24-4].)

### B. Complaints to Gawin About Exclusion

Waite testified that in March or April 2013, an employee named Bernadette Connolly Buntin directed or recommended that Waite exclude Isbell from meetings at which employees would discuss their individual "work streams" (these meetings were called "Work River"). (Waite Dep. 17:8–22, 33:10–37:11.) Waite further testified that Isbell was also excluded from GVD meetings (again, one of Isbell's primary responsibilities), also beginning in March or April 2013.[3] (*Id.* at 38:18–39:1.) Isbell testified that Waite lied about the exclusion, telling her that it was the result of an e-mail "glitch," when she confronted him (she does not say when she did so). (Isbell Dep. 45:23–46:18.) Waite himself does not recall speaking directly with Isbell about her exclusion from GVD meetings. (Waite Dep. 42:16–18.)

In late 2012 or early 2013, Isbell complained to Gawin that Waite was excluding her from meetings. (Gawin Dep. 46:13–47:15.) Gawin testified that she did not document or report this complaint because she did not believe Baxter required her to do so. (*Id.* at 47:16–48:24.) Isbell told Gawin that the exclusion made it difficult for Isbell to complete her work. (*Id.* at 50:23–51:10.) Sometime after Isbell complained to Gawin, Gawin spoke to Waite; at some point later, Gawin says, Isbell told her she was being included more frequently. (*Id.* at 58:19–60:23.) Another time in 2012 or early 2013, Isbell again complained to Gawin, this time about being

---

[3]     Although Waite stated that it was Gawin and another employee, Susan Berek, not Waite himself, who decided to exclude Isbell, he was testifying about the contents of an e-mail. (Waite Dep. 39:2–13.) As the e-mail is not in the record, the testimony is inadmissible (see below).

excluded from "broader renal team efforts." (*Id.* at 62:9–64:1.) Gawin testified that another of Isbell's coworkers, Tom (no last name is specified) had complained about the same thing. (*Id.* at 65:24–66:11.) Though Waite was part of the renal team, Gawin characterized this complaint as a "general complaint," not specifically about Waite. (*Id.* at 64:1–65:8.) Gawin spoke to the renal group leader, but again did nothing else to document or report Isbell's grievance.[4] (*Id.* at 65:9–67:4.) Gawin testified that Isbell "complained about a lot of people," but these were the only specific instances she could recall. (*Id.* at 67:10–24.)

## II. Baxter Employees' Complaints About Isbell

Meanwhile, Gawin developed concerns about Isbell's work performance. Specifically, "Gawin's personal observations of [Isbell's] work led Gawin to conclude that [Isbell] did not understand Market Access." (DSOF ¶ 15.) Gawin attributed "a number of . . . big deliverables that had been missed along the way" to Isbell's performance (Gawin Dep. 81:24–82:4), and Gawin believed Isbell "lacked the expertise to work effectively with Baxter's key opinion leaders." (DSOF ¶ 17.)

Throughout 2013, multiple employees, including Baxter executives, complained about Isbell, often directly to Gawin. (*Id.* at ¶ 18.) Isbell herself admits that several of these complaints were made. (Pl.'s Resp. to DSOF ¶ 18.) In particular, sometime in 2013—Gawin could not give a specific date—Seema Sondhi, who led Baxter's European health economics team, told Gawin that Sondhi's team members found calls with Isbell to be "a waste of time and unproductive[.]" (Gawin Dep. 74:3–75:21.) Gawin was unable to identify which team members specifically felt this way. (*Id.*) Gawin also identified other complaints; though she did not say when she received them, the parties apparently agree that the complaints against Isbell were

---

[4]  Isbell claims that Gawin's failure to report these two complaints to HR violated Baxter policy. (PSOAF ¶ 8.) In the deposition testimony she cites, however, her lawyer attempted to establish that Baxter policy dictated that *Inglese* should have reported Isbell's *2012* complaint. The testimony in question does not address Baxter policy for reporting Isbell's complaints that she had been excluded from meetings. Dep. of Julie Junkin, Ex. C to PSOAF [34-1] 60:24–64:16.)

made in 2013.  (Gawin Dep. 79:14–81:23;  *see* DSOF ¶ 18.)  Another health economics team leader, Suzanne Laplante, told Gawin, as Baxter characterized it, "that [Isbell] did not comprehend basic material, was not listening to other people's input on conference calls, ignored written input co-workers had sent her[,] and was alienating members of the global team."  (DSOF ¶ 20.)  Lili Wei Turek and Angela Murray, both Senior Directors for Market Access, complained to Gawin about Isbell's work performance.  (*Id.* at ¶ 22.)  Gawin testified that Tom Dovas, another co-worker, "complained not about her performance, but because of her performance, people were coming to him and asking him to do work that [Isbell] was supposed to be doing."  (Gawin Dep. 80:3–15.)

Similarly, on June 25, 2013, Bruce Culleton, Baxter's Senior Medical Director, e-mailed Turek and another employee, who presumably had some authority over staffing, about staffing for a strategy team.  (Ex. 1 to Aff. of Antoinette Gawin ("Gawin Aff."), Ex. C to DSOF [24-2]; *see* Culleton Dep. 15:8–19.)  Culleton requested that Isbell and another employee be replaced with "more senior members of Market Access."[5]  (*Id.*)  On July 19, 2013, he again e-mailed Turek, this time relating that two Baxter employees, Hoyee Leong and Rona McGreevy, were

> very concerned with [Isbell's] style in the management of a trusted vendor and her poor communication skills with the internal GVD team.  Rona McGreevy stated that she was embarrassed by [Isbell's] behavior during a teleconference[.]
>
> I strongly believe that [Isbell's] ongoing participation in this process will lead to continued dysfunction, missed timelines, and poor quality.

(Ex. 2 to Gawin Aff., Ex. C to DSOF [24-2].)

Culleton also testified that he met with Leong and McGreevy, and that McGreevey told Culleton about a conference call; McGreevey said that she "had never felt so embarrassed to be a Baxter employee because of [Isbell's] performance and the way she treated the people on the

---

[5]  Culleton also testified to the contents of this e-mail at his deposition (Culleton Dep. 25:4–19), which Isbell objects to as inadmissible.  (Pl.'s Resp. to DSOF ¶ 24.)  The court will exclude the testimony (see below), but the court notes that Culleton's testimony is not inconsistent with the contents of the e-mail itself, which is in the record and properly considered by the court.

other end of the line." (DSOF ¶ 28; Culleton Dep. 29:21–34:11.) Turek forwarded both of Culleton's e-mails to Gawin. (*See* Ex. 1–2 to Gawin Aff., Ex. C to DSOF.) Gawin testified that sometime in 2013, while the GVD project was in progress, she discussed Isbell's performance with Culleton; Gawin characterized Culleton's opinion as "[Isbell] doesn't know what she's doing." (Gawin Dep. 78:19–79:13.) Without offering more specifics, Culleton himself testified that he was "frustrated" about the GVD development and that he "felt that [Isbell] was incompetent in her management and development of the GVD. The GVD . . . . was next to garbage when it was done. So much so that we had to suggest that [the project vendor] start again." (Culleton Dep. 41:19–42:7.)

Waite also testified to several complaints that he received about Isbell, though he did not recall when they occurred. (Waite Dep. 62:21–63:6.) For example, Derek Wiebenson, a manager in Europe, complained that "[Isbell] had not taken . . . feedback" despite "repeated attempts." (*Id.* at 63:1–3, 7–23.) Waite also related complaints from Josh Miller, a senior director of operations and strategy, that Isbell did not listen to feedback and that Miller would not "go to any more meetings [for a project that Isbell led] because there wasn't a value in them." (*Id.* at 63:3–4, 63:24–64:9.) Waite testified that he received complaints from Ursula Ruegsegger, director of marketing in Europe, and Keely Stevenson, a manager in Europe, as well, though he did not describe the contents of those complaints. (*Id.* at 62:21–63:6.) Waite described a meeting in January or February 2013 with "leadership"[6] where he gave feedback about Isbell for a written review. (*Id.* at 56:11–58:2, 58:18–59:5.) Waite does not recall whether Gawin attended that meeting, but he believed that he met with Gawin about Isbell's performance "in that period of time." (*Id.* at 58:12–17.)

---

[6] Waite testified that Miller, Eric Noshay, and his own supervisor, Lisa Rometty were present, along with Baxter HR representatives and others he could not recall. (Waite Dep. 56:11–59:5.)

Isbell testified that, in May or June 2013, Gawin told her that Waite and Culleton did not want her attending their meetings.[7] (Isbell Dep. 167:23–169:15.) Culleton, however, did not recall discussing Isbell's performance with Gawin. (Culleton Dep. 24:1–7.) In light of the resistance to Isbell's participation in meetings, Gawin testified that she "struggled" to determine how Isbell could "get the content and deliverable met." Gawin concluded that Isbell "did not understand [M]arket [A]ccess." (Gawin Dep. 69:5–24.) Gawin described her opinion of Isbell's work:

> [W]e were getting to a point where no one wanted to work with [Isbell].
>
> So we not only had an issue of the projects not being delivered, I had been rescoping and restructuring them and putting other people in those projects so that we could get them delivered to the rest of the business. But we got to a point where I had nothing left that I could scope out so narrowly to let her do.
>
> And she had alienated so many people that we were losing credibility as a team, as function, and I was losing credibility personally because I wasn't addressing the issue.

(*Id.* at 82:1–15.) Gawin had "ongoing discussions about [Isbell's] performance[,]" and she testified that she and Isbell had "very frequent coaching sessions."[8] (*Id.* at 73:1–74:2.)

---

[7] Isbell denies this partially because "Culleton denied that he was ever formally charged with the responsibility to, or was ever asked to, evaluate Ms. Isbell's performance." (Pl.'s Resp. to DSOF ¶ 37.) But this is not inconsistent with Culleton's testimony. He did testify, moreover, that he "informally" provided feedback to Susan Berek and Lili Turek. (Culleton Dep. 24:8–15.)

[8] Isbell partially denies this fact on the grounds that "Ms. Gawin testified, without foundation, that Ms. Isbell 'knew' that they were having so-called 'coaching' sessions, but did not testify that [Gawin] ever told [Isbell] that these were coaching sessions." (Pl.'s Resp. to DSOF ¶ 39.) Gawin testified that she did tell Isbell that these were coaching sessions:

Q: . . . [H]ow many times do you claim you talked to her verbally about her allegedly not having the skills or competencies?

A: I don't know that I could put a number on it, but we had very frequent coaching sessions.

Q: Did you tell her—

A: I—

Q: —that they were coaching sessions?

A: *Yes.* She knew that they were coaching sessions.

Gawin testified that she started discussing terminating Isbell with Julie Junkin, Baxter's Human Resources Director. (*Id.* at 83:15–84:9; Dep. of Julie Junkin, Ex. C to PSOAF ("Junkin Dep.") [34-1] 21:2–23.) She could not, however, recall precisely when this first discussion occurred, other than it was "probably" two to three months before actually terminating Isbell in August 2013:

> Q:   Okay. When did you talk to Junkin about firing [Isbell]?
> A:   Without going back through logs, I don't know precisely. But I would—it—it would have probably been—you know, we had been talking about her performance for some time. So when somebody is underperforming at that level, letting go of somebody is always something you're thinking about, you know, if this person doesn't work out, particularly with a really small team. So I would say probably, in the, you know, two to three months leading up to that at least.
> Q:   Because you—you—so you talked to—according to you, you talked to Junkin about firing Debbie two to three months prior to the time that she was fired?
> A:   Probably. I think things came to a head because we had gotten so many formal complaints from other parts of the business where people were then going in to their HR people and saying these market access people don't know what they're doing.

(Gawin Dep. 83:15-84:9.) Junkin testified that she told her own supervisor that Gawin wanted to let Isbell go in "[a]pproximately the end of June, the beginning of July of 2013." (Junkin Dep. 58:2–22.) Gawin testified that she and Junkin "both went away [from their discussion about terminating Isbell] and said let's think about it, what are the other options." (Gawin Dep. 85:9–18.) Gawin thought that Junkin "wanted to talk about it with her HR leader" and "wanted to check with some other people, you know, about implications," while Gawin "wanted to think about it in the context of the team, and was something else [sic] we could do." (*Id.* at 85:9–23.)

On July 12, 2013, Isbell e-mailed Gawin that she wanted to apply for two other positions posted at Baxter. (Ex. 29 to Isbell Dep., Ex. B to DSOF [24-1] at 538.) On July 24, 2013, Gawin and Isbell had a phone conversation about Isbell's performance. (DSOF ¶ 43; *see* Isbell Dep.

---

(Gawin Dep. 73:10–20) (emphasis added.) Whatever label may have been attached, Isbell does not deny frequent meetings with Gawin about her performance. (Pl.'s Resp. to DSOF ¶ 39.)

230:22–235:21.)  The parties agree that Gawin "screamed" at Isbell (DSOF ¶ 44), and Isbell testified that it "was a one-way conversation, and there were not questions asked of me.  It was basically [Gawin] screaming at me[.]"  (Isbell Dep. 234:16–235:7.)  Gawin told Isbell that "this isn't working out."  (DSOF ¶ 45.)  Gawin wrote a memorandum to summarize this conversation; Gawin wrote that she warned Isbell that her "relationships within the team have deteriorated, and the working process is challenging at best."  (Ex. 3 to Gawin Aff., Ex. C to DSOF [24-2].)  Gawin's memo also states that she told Isbell that Gawin had received "unsolicited feedback" about "unprofessional behavior" and "unwillingness to support group decisions."  (*Id.*)  Gawin "urged [Isbell] to reflect on her assumptions" and "evaluate both her communications and her interpersonal interactions."  (*Id.*)  Isbell denies that the memorandum accurately reflects the call, but does not explain how it is inaccurate.  (Pl.'s Resp. to DSOF ¶ 46.)

## III.    Isbell's July 2013 Complaint to Junkin and Investigation

On July 12, 2013 (the same day that Isbell e-mailed Gawin about her interest in other positions), Isbell e-mailed HR Director Junkin with three complaints.  First, she complained that Waite "continues to discredit me at meetings, cuts me off, does not allow me to ask questions which are germane to the discussion, not inviting me to meetings that I need to be present at which inform my workflow (i.e. GVD), talking to others about me to get them not to cooperate with me."  (Ex. 28 to Isbell Dep., Ex. B to DSOF [24-1] at 540–41.)  Second, she accused Waite of retaliation because of her complaints to Inglese that the references to Cialis and the marketing materials in Waite's office made her uncomfortable.  (*Id.*)  Finally, she claimed that Waite and another employee had asked for feedback on a marketing strategy, which she provided, but then "they cut off the discussion and I did not see the marketing pieces again. . . . This started a cascade of events which began with me being taken off of meetings in retaliation for giving honest feedback when asked."  (*Id.*)  In this e-mail, Isbell pointed out that Junkin had not accepted Isbell's request for a phone call from Isbell, and Isbell asked for Junkin's supervisor's name, so that Isbell could contact the supervisor if Junkin was not available.  (*Id.*)

11

Junkin considered this request "bullying" and a threat to go to Junkin's boss. (Junkin Dep. 45:3–17.)

Junkin did agree to speak to Isbell, and she and Isbell spoke on the phone on July 16, 2013, about these complaints (this appears to be the meeting that Isbell had requested). (DSOF ¶ 62.) Junkin testified that Isbell also complained about Culleton, though Isbell did not mention Culleton in her July 12 e-mail. (Junkin Dep. 43:7–47:16.) Junkin recalled that Isbell also "mentioned" Inglese during this conversation, but the parties cite to no testimony that Isbell renewed her 2012 complaint about Inglese, who was no longer at Baxter. (*Id.*) Junkin testified that at the time of this call, she and Gawin had already discussed terminating Isbell, and that Gawin had "pretty much" decided to do so. (*Id.* at 60:3–23.)

Junkin concluded that it would not be appropriate for her to investigate Isbell's complaints because she (Junkin) had discussed Isbell's termination with Gawin. Instead, Junkin conferred with her supervisor, Betty Larson, and asked Larson to recommend a "neutral" party to investigate Isbell's complaints (presumably, someone who was not familiar with the complaints against Isbell), and Larson gave her Tywnia Brewton's name. (*Id.* at 54:22–55:11) Junkin asked Brewton, a senior manager, to investigate Isbell's grievances. (*Id.* at 28:18–22; *see* Dep. of Tywnia Brewton, Ex. B to PSOAF ("Brewton Dep.") [34] 39:20–40:8.) Brewton testified that she was unaware that anyone at Baxter was considering disciplining or terminating Isbell. (Brewton Dep. 61:10–62:3.) Though Junkin made Gawin aware that Isbell had made a harassment complaint, Gawin did not participate in or know any details of Brewton's investigation. (DSOF ¶ 65.)

Julie O'Brien, an HR representative, assisted Brewton with the investigation. (Brewton Dep. 53:12–20.) Brewton and O'Brien interviewed Isbell, Waite, and four of the six other people that Isbell suggested Brewton interview.[9] (*Id.* at 62:4–8, 84:11–85:21, 91:9–17, 103:8–13.)

---

[9] Isbell claims that the failure to interview all the individuals whose names came up during the interviews was contrary to Baxter's policies (PSOAF ¶ 21), but the cited testimony

Waite acknowledged that he kept Cialis marketing materials in his office. (*Id.* at 103:20–104:9.) Brewton went to his office and looked at the marketing materials;[10] Waite testified he used the Cialis bathtubs to hold business cards and dice, and he also kept a mouse pad and binder that displayed the Cialis logo, as well as a glass dish that recognized a Cialis sales milestone. (Waite Dep. 27:5–31:25.) Waite recalls that after Brewton saw the objects, she said she was not concerned about them; Waite did not remember exactly what Brewton said, but in Waite's words, Brewton concluded that they were not "a big deal." (*Id.* at 30:3–31:6.)

Brewton and O'Brien took notes during their interviews, but did not record their questions or answers verbatim. (Brewton Dep. 64–69, 97–100.) They prepared a file memorandum summarizing their interview notes (again, not verbatim). (Ex. 2 to Aff. of Tywnia Brewton ("Brewton Aff."), Ex. F to DSOF [24-3].) Brewton concluded that Isbell "was credible in the sense that she believed what she was saying," but Brewton "could not substantiate her claims." (Brewton Dep. 104:21–105:9.)

On August 5, 2013, Brewton and O'Brien gave Junkin their report. In the report, they reached the following conclusions:

- After conducting interviews with the identified individuals, we learned that there is no evidence supporting the claim of retaliation.
- Meetings were disbanded [sic] in between when Gary Inglese left and prior to the reorganization of Market Access under Antoinette Gawin.
- There is no evidence of non-inclusive behavior by any team members.
- There is no evidence of retaliation due to issue being raised about the Cialis discussion and/or paraphernalia in Blair Waite's office.

(Ex. 1 to Brewton Aff., Ex. F. to DSOF [24-3].) In the report's details, Brewton and O'Brien wrote "[Isbell's] claims seemed to be based on misinterpretation." (*Id.*) The report also stated

---

does not support that statement. Brewton agreed that it would be contrary to Baxter policy to "ignore interviewing people whose names come up" during interviews. (Brewton Dep. 102:20–103:7.) But Brewton also testified that the people she did not interview "weren't raised in the context of potential witnesses" and they "didn't seem relevant to the case against [Waite]." (*Id.* at 101:12–102:16.)

[10] Isbell testified Waite removed the materials from his office after her 2012 complaint, but Brewton appears to have had access to them during her investigation.

that three of the four third-party witnesses that Isbell herself had identified "commented on [Isbell's] disruptive and inappropriate behavior."[11]  (*Id.*)  The report concluded "[t]here is no evidence to substan[t]iate either claim by Debbie Isbell.  Will turn over to [HR] for final decision on outcome of investigation." (*Id.*)  Baxter took no action against Waite.  (Brewton Dep. 107:15–108:13.)

## IV.    Isbell's Termination

Gawin testified that, as Isbell's supervisor, she decided to terminate Isbell.[12]  (Gawin Dep. 68:2–4.)  She made this decision "probably" within the month before actually doing so; she explained that the HR process and the misalignment of Junkin's, Gawin's, and Isbell's schedules caused the delay in telling Isbell.  (*Id.* at 86:6–87:15.)  Junkin reviewed Brewton's investigation report (Junkin Dep. 28:4–29:6), and at some point before Isbell was terminated, Junkin told Gawin that "there had been no validation" to Isbell's complaint.  (DSOF ¶ 71.)

---

[11]    Isbell denies this fact in part, but does not explain why, other than to claim that it is not material.  (Pl.'s Resp. to DSOF ¶ 70.)

[12]    Isbell disputes that Gawin testified that this was her decision *alone*; Isbell claims that Gawin actually testified that Gawin and Junkin decided *together* to terminate Isbell (though Junkin also testified that it was Gawin's decision (Pl.'s Resp. to DSOF ¶ 47)).  But Gawin affirmatively testified that she alone was the one who decided:

Q:    Okay.  And then you're the one that decided to fire [Isbell]?
A:    Correct.

(Gawin Dep. 68:2–4.)  Isbell's contention that Gawin actually testified that she and Junkin decided together rests on Gawin's responses to subsequent questions from Isbell's counsel that make that assumption, but not on Gawin's actual testimony to that effect:

Q:    . . . . Can you tell me with—with any specificity at all, when, prior to [Isbell] actually being told she was being fired, when prior to that *you and Junkin* made the decision to fire her?
. . . .
A:    . . . . I—I would say it would probably have been in the month—within the month prior.  I wouldn't feel comfortable narrowing it down much beyond that.

(*Id.* at 86:6–20) (emphasis added.)  This is just one example of a deposition question that mischaracterizes the testimony or assumes a fact not in evidence.  Gawin simply answers the main question and does not contradict its assumption, but also does not *affirmatively testify* that she and Junkin made the decision together.  Because Isbell cites to no evidence where Gawin actually confirms that she and Junkin decided together, the court concludes the testimony that Gawin made this call on her own is not rebutted.  Gawin did testify that she and Junkin decided together *when* to terminate Isbell (*id.* at 83:7–14), but this too is not inconsistent with the assertion that the decision to terminate Isbell was Gawin's alone.

Gawin and Junkin told Isbell that she was being terminated on August 13, 2013 (eight days after Brewton finished her report). (*Id.* at ¶ 49.) Isbell testified that Junkin told her that Isbell would not be able to get the two positions that she posted for. (Isbell Dep. 247:15–248:14.) In 2014, after Isbell was terminated, Brewton investigated another employee's complaint of gender discrimination that she found to have merit—Baxter terminated a vice president and a region manager as a result. (Brewton Dep. 32:5–35:22.)

Isbell filed this action on August 20, 2015, alleging one count of age discrimination under 29 U.S.C. § 621, *et seq.*, and one count of retaliation under 42 U.S.C. § 2000e, *et seq.* (*See generally* Compl. [1].) Baxter filed this motion for summary judgment on both counts. As Isbell has not challenged Baxter's motion with respect to the age discrimination claim, summary judgment is granted on that count. The court addresses Isbell's retaliation claim below.

<u>**DISCUSSION**</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005). The court construes the evidence and all reasonable inferences in the light most favorable to the plaintiff, without determining its objective accuracy. *Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014); *O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir.1997).

**I.    Evidentiary Issues**

Isbell denies several facts in Baxter's Rule 56.1 Statement of Facts on the grounds that the evidence supporting them is inadmissible. First, Isbell claims that Gawin and Waite testified to complaints that they received about Isbell that lacked a proper foundation. (Pl.'s Resp. to DSOF ¶¶ 19, 31, 34–36.) In particular, Isbell objects to (1) Gawin's testimony that Sondhi related that Sondhi's team concluded that calls with Isbell were "a waste of time and unproductive," because Gawin did not identify a specific team member who felt this way, nor when in 2013 this conversation occurred; (2) Gawin's testimony to Culleton's opinion that Isbell

"doesn't know what she's doing," because that was Gawin's characterization of Culleton's opinion, not his own words, and "Gawin did not provide a date (or even year), time, place, or participants for this alleged conversation" (*id.* at ¶ 31); (3) Waite's testimony that Derek Wiebenson complained that Isbell ignored feedback (Isbell also points out that Waite does not testify that Gawin knew of these complaints); (4) Waite's testimony that Josh Miller refused to attend any more meetings with Isbell; and (5) Waite's general testimony about Ursula Ruegsegger's and Keely Stevenson's complaints about Isbell, because he did not describe specific complaints.

Evidence at the summary judgment stage must be admissible at trial. *See Johnson v. Holder*, 700 F.3d 979, 982 (7th Cir. 2012) "But no rule of evidence requires a 'foundation'; 'foundation' is simply a loose term for preliminary questions designed to establish that evidence is admissible." *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001), *as amended on denial of reh'g* (Nov. 26, 2001). "An objection to lack of foundation is formal, and evidence provided at the summary judgment stage need only be admissible in content, not necessarily in form." *Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 960 (N.D. Ill. 2001) (quoting *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir.1994)). To be admissible, evidence need only have "any tendency to make a fact more or less probable than it would be without the evidence[.]" FED. R. EVID. 401(a). A witness testifying must do so based on personal knowledge. FED. R. EVID. 602.

Gawin's testimony about Sondhi's and Culleton's complaints is admissible only for their impact on Gawin, not for the truth of their contents. *See* FED. R. EVID. 801(c)(2). Even if Gawin did not hear all the details of the incidents that Sondhi and Culleton complained of, these complaints could still have influenced Gawin's decision to terminate Isbell. Furthermore, Gawin's testimony gives some context to the complaints. For example, Gawin testified that Sondhi's and Culleton's complaints were among those that prompted Gawin to conduct coaching sessions with Isbell (Gawin Dep. 73:10–74:19, 76:17–78:24)—Gawin accordingly

received these complaints about Isbell before the coaching sessions.[13] That the court knows the gist of Culleton's complaint, but not its exact contents, does not make the evidence irrelevant or outside of Gawin's knowledge.

Second, Isbell objects to three lines of evidence on best evidence and hearsay grounds. (Pl.'s Resp. to DSOF ¶¶ 24, 27, 60.) First, Culleton testified to the contents of a June 2013 e-mail he sent Turek, where he wrote that Isbell "was not contributing and was too junior to be on that team." (Culleton Dep. 25:4–19.) Second, Culleton testified to Leong and McGreevey's complaints about Isbell, which he shared with Turek via e-mail in July 2013. (*Id.* at 29:21–34:11.) Finally, Waite testified that Gawin and Berek e-mailed him that they were excluding Isbell from meetings, but the e-mail is not in the record.

The two e-mails from Culleton, which are in the record, are themselves admissible. "Rule 901(a) provides that e-mail evidence is admissible if authenticated by 'evidence sufficient to support a finding that the item is what the proponent claims it is.'" *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012) (quoting FED. R. EVID. 901(a)). Authentication can be established by "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." FED. R. EVID. 901(b)(4). In *Fluker*, the Seventh Circuit held that a series of e-mails were authenticated, despite there being no evidence from witnesses with knowledge that the sender actually sent them. 698 F.3d at 998–1000. The court noted that the e-mail identified the author within it, that it was sent from an e-mail address that appeared to be from the organization where the purported sender was known to be affiliated, and that the contents revealed knowledge that supported that the sender was in fact who he appeared to be. *Id.*

Here, Gawin provided copies of two forwarded e-mails from Turek and stated in an affidavit that she received them from Turek's e-mail address. (Gawin Aff., Ex. C to DSOF.) The

---

[13]     Contrary to Isbell's claim, Gawin testified that Culleton gave her this feedback in 2013. (Gawin Dep. 78:19–79:13.)

e-mails from Turek are e-mails originally sent from Culleton's e-mail address to Turek and then forwarded to Gawin. (Ex. 1–2 to Gawin Aff., Ex. C to DSOF.) The original e-mails have Culleton's name and title in the e-mail signature; one shows the sender's address bruce_culleton@baxter.com; and the contents demonstrate knowledge of the GVD project, Baxter employees, and Isbell's performance. (*Id.*) Finally, Isbell admits that these e-mails in the record are the same e-mails that Culleton testified he sent to Turek. (Pl.'s Resp. to DSOF ¶¶ 26, 30.) Thus, the e-mails themselves are admissible and are relevant for a non-hearsay purpose: for their effect on Gawin. Because these e-mails are writings, however, Culleton's deposition testimony, where he refers to the e-mails' contents, is not.[14] *See* FED. R. EVID. 1002. Waite similarly cannot testify to the contents of any e-mails Gawin and Berek sent him without Baxter providing that e-mail. The court will therefore not consider Waite's testimony about what Gawin and Berek wrote in any such e-mails.

## II.    Retaliation

To succeed on a retaliation claim, Isbell must present evidence that she engaged in statutorily protected activity, that she suffered an adverse action, and that there is a causal connection between the two. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016). The court considers the evidence as a whole to determine whether a reasonable jury could find that the causation element is satisfied; the court does not distinguish between direct and indirect evidence. *See Williams v. Office of Chief Judge of Cook Cty.*, 839 F.3d 617, 626 (7th Cir. 2016) (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). "[T]he core question is . . . 'could a reasonable trier of fact infer retaliation?'" *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (quoting *Castro v. DeVry Univ.*, 786 F.3d 559, 564 (7th Cir. 2015)). This evidence, whether previously characterized as direct or indirect, can

---

[14]    In particular, Culleton's testimony about what Leong and McGreevy complained about is also inadmissible—it is not clear whether Culleton transmitted those complaints, in addition to the e-mail itself, to Gawin. Isbell's other objection to Culleton's testimony about the July 2013 e-mail (lack of foundation) is therefore moot.

include: suspicious timing, evidence that similarly-situated employees who did not engage in protected activity received systematically better treatment, evidence concerning the plaintiff's performance, and whether the employer's stated reason for the adverse employment action was legitimate or appears to be a pretext. *See Poullard*, 829 F.3d at 856; *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). Isbell suffered an adverse employment action when she was terminated. Thus, the court first examines whether any of Isbell's complaints were protected activity. Second, the court considers whether a reasonable jury could find that Baxter retaliated against Isbell for those complaints.

### A.     Protected Activity

An employee who opposes an unlawful employment practice engages in protected activity. *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). A plaintiff claiming retaliation "must not only have a subjective (sincere, good faith) belief that [she] opposed an unlawful practice; [her] belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Hamner v. St. Vincent Hosp. & Health Care Ctr.*, Inc., 224 F.3d 701, 707 (7th Cir. 2000). Isbell contends that her complaints are protected unless they are utterly baseless, but this argument misstates the standard: true, "the framers of Title VII [did not want] to encourage the filing of utterly baseless charges," but something more than "not utterly baseless" is necessary. *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982). Protected activity that could trigger a retaliation claim must still meet the requirements of "good faith and reasonableness." *Id.*

Isbell contends that she opposed unlawful employment practices; she argues that her complaints to Inglese, Junkin, and Gawin were about sexual harassment, which is prohibited by Title VII. If that is the case, then her complaints are protected activity. But if her complaints are

of general harassment, not of a sexual nature, then the complaints are not protected activity because they do not identify conduct prohibited by Title VII. *See Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014) ("Complaining about a co-worker's actions is not statutorily protected expression when the complained of conduct does not relate to [protected status].")

### 1.    2012 Complaints to Inglese

Isbell's 2012 grievance to Inglese named three complaints: Waite had come inappropriately close to her and whispered "you're paranoid" in her ear, Waite regularly spoke of the Cialis marketing campaign in team meetings, and Waite and Inglese twice joked about Cialis in Waite's office while Isbell was present. Isbell nowhere suggests that the first action, Waite's whispering in her ear, was sexual harassment, so that aspect of the complaint is not protected.

Isbell does claim that her 2012 complaints "were clearly regarding conduct that was of an offensive sexual nature" because "Waite and others regularly made sexual banter and talked about erectile dysfunction at meetings, including 'I need some of that' and related comments." (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") [39] 5.) But Isbell conflates the two behaviors at issue. Waite did regularly talk about Cialis at meetings—he was obviously proud of his own successful marketing efforts—but Isbell admitted that the sexual banter and "I need some of that" comments occurred only twice. Neither the mentions of Cialis at the group meetings nor the two jokes reasonably describes sexual harassment, as explained below.

The references to the Cialis marketing campaign and the marketing materials in Waite's office made Isbell uncomfortable, and she believes those comments were inappropriate. Characterizing these episodes as harassment is not objectively reasonable, however. TV advertisements for Cialis and similar medications run regularly. Isbell testified that these ads, too, make her uncomfortable, but she does not assert that these advertisements are themselves demeaning toward women or are explicit. References to the marketing of an erectile dysfunction drug, even if repeated and irrelevant, are not inherently sexual harassment. In any case, Isbell makes no showing that these general marketing references, apparently made at

team meetings, nor the materials on display in Waite's office, were directed as Isbell herself, or at females in general.

Waite's and Inglese's jokes about needing Cialis could have been directed at Isbell—she was, after all, alone with them when they made the remarks. It is true that "the objective reasonableness of the belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008). But sexual harassment must be severe and persuasive and must have occurred because of the plaintiff's sex. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016). Whatever the propriety of Waite's two jokes, there is no indication that they were intended to harass Isbell. The jokes occurred only twice and the comments took no more than one minute each; there was no touching involved, and Isbell identifies no other conduct that is both sexually charged and directed at her. *Compare O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (finding the complained-of conduct was not harassment when it was "a single instance of sexually-charged remarks which, however imprudent they may have been, were relatively tame") *with Magyar*, 544 F.3d at 772 (finding the plaintiff complained of harassment when "a man old enough to be her father plop[ped] into her lap and put his lips to her ear to whisper 'you're beautiful'") *and Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1309, 1315–16 (7th Cir. 1989) (finding protected activity when the plaintiff complained of being given a draft of a job description for her own position that had "Big Boobs" written under the "Physical Demands" section).

Isbell claims that the court should not rule on this issue because there are "genuine issues of material fact as to whether Waite engaged in the conduct that Isbell accused him of in 2012[,]" and points out that Waite denied making the jokes. (Pl.'s Resp. 5.) But because the evidence is construed in Isbell's favor in light of Baxter's motion, the court assumes that Waite and Inglese *did* in fact make these jokes. What matters is whether Isbell's belief that such

conduct violated Title VII was objectively reasonable.[15]    These jokes may have been inappropriate, and they made Isbell uncomfortable.   But there is no evidence that Waite or Inglese made these jokes because of Isbell's sex, nor even that Isbell believed that was the case.   Not every inappropriate remark in the workplace is harassment, and complaints about these remarks are not protected activity.

### 2.    2012 or 2013 Complaints to Gawin

Isbell's two complaints to Gawin in 2012 or early 2013 are also not protected activity. First, Isbell complained that Waite was excluding her from meetings, but Isbell presents no evidence that she told Gawin that she thought this was because of her gender or in retaliation for her complaint to Inglese.   Second, Isbell complained she was generally being excluded from meetings, but again, there is no evidence that this complaint was even specifically about Waite, nor that it was related to gender or retaliation.   In fact, Gawin testified that another male employee also complained that he was being excluded from these meetings.   Indeed, Isbell has cited to no evidence that she told Gawin in either of these complaints that she was being excluded *because* of her gender or in retaliation for an earlier complaint.   As a result, the fact that Gawin did not report these complaints is irrelevant; the evidence is only that Isbell complained about being excluded from meetings.   Because these complaints are not about conduct prohibited by Title VII, they are not protected activity.

---

[15]    Isbell also argues that the conduct underlying her complaint need not support its own Title VII harassment claim.   (Pl.'s Resp. to Def.'s Mot. for Summ. J. [39] 7.)   That is of course correct, but the cases that Isbell cites do not suggest that her belief that her complained-of conduct violated Title VII was objectively reasonable.   *Cf. Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 231, 234 (7th Cir. 2004) (finding plaintiff's belief reasonable when coworkers had made negative comments and actions about her Catholicism); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1457–58 (7th Cir. 1994) (finding plaintiff's belief reasonable when her superior made multiple suggestive comments directly to her and commented on her posterior); *Beamon v. Hewitt Assocs.*, No. 03 C 0794, 2004 WL 2038169, at *7 (N.D. Ill. Sept. 8, 2004) ("It was reasonable for Plaintiff to think that her involvement in the investigation was protected activity, especially because Ms. Norman provided Plaintiff with a copy of Hewitt's discrimination policy, which discusses and forbids, *inter alia*, sexual harassment."); *Bevilacqua v. Cubby Bear, Ltd.*, No. 98 C 7568, 2000 WL 152135, at *7 (N.D. Ill. Feb. 4, 2000) (defendant did not dispute that plaintiff held a reasonable and sincere belief that her complaint was protected).

### 3. July 2013 Complaint to Junkin

In her 2013 complaint to HR, Isbell apparently reiterated her 2012 complaints about Cialis. While the marketing materials and related discussions of Cialis seem to have continued, as explained above, it is not reasonable to consider those references sexual harassment. Isbell does not allege that the jokes continued or became more explicit or direct toward her or other women. The passage of time does not make these grievances protected.

But Isbell also complained to Junkin that Waite excluded her from meetings in retaliation for her Cialis-related complaints; this retaliation complaint did not repeat part of her 2012 complaint, though it was indeed predicated on it. Essentially, Isbell claims that her complaint of retaliation in 2013 was protected activity to establish this retaliation cause of action. The parties have cited no cases where the protected activity was *itself* an internal complaint of retaliation, but retaliation is, after all, an unlawful employment practice. *See* 42 U.S.C. § 2000e-3. That said, the same reasonableness and good faith requirements apply.

The court finds that Isbell's belief that her exclusion from meetings was retaliation for her Cialis complaints was not objectively reasonable for two reasons. First, Isbell's e-mail to Junkin also claims that Waite was retaliating against her for her feedback on a marketing project, feedback unrelated to her apparent belief of sexual harassment. Second, there is evidence that several employees besides Waite also excluded Isbell from meetings, but there is no evidence that those employees knew of her 2012 Cialis-related complaints about Waite.

Isbell contends that Brewton admits that Isbell's July 2013 complaint was a claim of discrimination, and that it therefore was protected activity. (*See* PSOAF ¶ 30.) But the testimony Isbell cites does not contain an admission. Isbell cites the following:

> Q:  Okay. And you said there was [sic] three or four of these discrimination-related investigations. What are the other ones besides Juanso *and Isbell*? What are the other ones?
> A:  The Kreema Elim had discrimination tone [sic].

(Brewton Dep. 36:23–37:2) (emphasis added.)   Again, counsel's question incorporates an assumption—in this instance, that Isbell's complaint, like others that Brewton investigated, was one of discrimination.   In fact, this question is the only mention of Isbell's name in the cited testimony concerning discrimination investigations. Although Brewton did not contradict Isbell's counsel's unilaterally adding Isbell to this list, the court will not take Brewton's answer as an admission that the presumption in the question was true.   The testimony here is not a statement that either Isbell herself or Baxter representatives necessarily believed that Isbell's complaints were allegations of discrimination.[16]   But even if this single claim of retaliation were protected activity, Isbell's claim of retaliation fails for lack of evidence of causation.

### B.     Causation

#### 1.     Timing

Baxter cannot definitively say whether Gawin had decided to terminate Isbell July 12, when Isbell sent her e-mail to Junkin.   Gawin said she made the decision within the month before the date Isbell was terminated, August 8; but Gawin also testified that she first discussed it with Junkin about one to two months before that, while Junkin, too, recalls that Gawin began discussing it with her by the end of June or the beginning of July 2013.   Isbell asserts that at the time Gawin discussed Isbell with Junkin, Gawin had definitively decided *not* to terminate Isbell, but the record does not support this.   Instead, it appears that Junkin and Gawin simply did not reach a conclusion during the initial discussions.   Notably, Isbell has not shown that Gawin was aware she had complained about retaliation at all; Gawin knew that the July 12 complaint existed, but was not involved in the investigation, and Isbell admits that Gawin did not know "details."   A showing that Gawin was aware of the protected activity is fundamental to establishing retaliatory motive. *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009).   Gawin's awareness that Isbell had complaints about her co-workers does not mean

---

[16]     Related to this argument, Isbell also asks the court to find that Isbell engaged in protected activity as a matter of law.   Isbell has not moved for summary judgment, but regardless, the evidence does not support such a ruling.

she was also aware of statutorily protected expression. *See Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003).

For purposes of this ruling, the court might assume that Gawin had not decided to terminate Isbell until after her July 12 complaint. Isbell believes the timing is suspicious. In general, however, "[t]he timing of the complaints, standing alone, does not create a genuine issue as to a causal connection[.]" *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992).

### 2.    Isbell's Performance

Isbell does not identify persons who did not make complaints but were treated more favorably. She does argue, however, that she was meeting Baxter's legitimate expectations, but nevertheless discharged. Again, the evidence does not bear this out. "[T]he proper inquiry mandates looking at [the plaintiff's] job performance through the eyes of her supervisors[.]" *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). Importantly, Isbell must have been meeting Baxter's expectations at the time of her termination. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("[T]he fact that [the plaintiff] may have met expectations in the past is irrelevant; she must show that she was meeting expectations at the time of her termination.")

In fact, the evidence shows that Isbell had numerous conflicts with coworkers by the time she was terminated. Gawin had received complaints about Isbell from at least eight Baxter employees: Sondhi, Laplante, Turek, Murray, Dovas, Culleton, Leong, and McGreevey. Even if Gawin did not know the details of all the underlying incidents of these complaints, they readily support the conclusion that Isbell was not meeting expectations. Furthermore, Gawin knew that these complaints included that Isbell had acted unprofessionally while on the phone with a vendor and that Culleton thought she "didn't know what she was doing." Whether Isbell really was unprofessional or didn't know what she was doing is not the proper inquiry—these complaints make it reasonable for Gawin to conclude that Isbell was not meeting expectations,

and was motivated by her performance, not by Isbell's complaint. Again, Isbell admits that Gawin did not know "details" of her complaint to HR; Isbell presents no evidence that Gawin even knew that Isbell had ever complained that Waite excluded her from meetings in "retaliation" for anything, or even that Isbell had ever made Cialis-related complaints about Waite.

Isbell attempts to shift the burden of proof to Baxter. She contends that "[a]ny such evidence of those alleged deficiencies does not negate all possible reasonable inferences that Baxter fired Ms. Isbell in retaliation for coming forward with those internal complaints." (Pl.'s Resp. 3.) But as the plaintiff, it is Isbell's burden to present evidence to support such an inference, and even if Isbell had engaged in protected activity and been terminated soon after, that alone is not sufficient evidence to support such an inference on this record.

### 3. Gawin's Purported "Lies"

Isbell finds support for her claims in the notion that Gawin "lied" about the process leading up to Isbell's termination in three ways: (1) Gawin lied about who excluded Isbell from Culleton's meetings, (2) Gawin lied about who decided to exclude Isbell from Waite's meetings, and (3) Gawin lied about who decided to terminate Isbell. (Pl.'s Resp. 9–10.)

With respect to Gawin's alleged first "lie," Isbell notes that Gawin told her that Culleton did not want Isbell attending his meetings, while Culleton himself testified that he did not recall formally discussing Isbell's performance with Gawin. This testimony presents no direct conflict, and does not demonstrate a lie. In fact, there is record support for Gawin's statement: in Culleton's June 2013 e-mail, forwarded to Gawin, Culleton wrote "I'd like to replace Deb . . . with more senior members from Market Access." (Ex. 1 to Gawin Aff., Ex. C to DSOF.) Culleton's desire to replace Isbell with other staff is evidence that he did express a desire that she not attend his meetings, even if it is not a specific comment on her performance. True, Culleton did not tell *Gawin* that he did not want Isbell at his meetings—he shared his concerns with Turek,

who forwarded them to Gawin. But Gawin did know of Culleton's reluctance to continue working with Isbell, even if Culleton did not tell her directly.

Regarding Gawin's second alleged "lie," Isbell notes her own testimony that Gawin told her that Waite did not want Isbell in meetings. Isbell claims that Gawin herself made this decision, so Gawin's telling her that the decision was Waite's was a "lie" But the evidence that Isbell relies on to establish that Gawin was the decision-maker concerning these meetings is Waite's testimony that it was Gawin and Berek who made the call—testimony that Isbell herself has argued is inadmissible. Waite did testify that in March or April 2013, Bernadette Connolly Buntin directed or recommended that Waite exclude Isbell from Work River meetings, but this is not inconsistent with Waite's then asking Gawin to remove Isbell from meetings. Third, Isbell claims that Gawin lied about who decided to terminate Isbell. As explained above, Isbell's claim that Gawin stated that she and Junkin, not Gawin alone, made this decision is not supported by the testimony. None of these purported "lies" indicate that Gawin's reason for terminating Isbell was a pretext for retaliating against her.

### 4. "Sham" Investigation

Finally, Isbell claims that Brewton's investigation was a sham, which she claims shows pretext. In support, Isbell contends that (1) Brewton did not follow procedures, (2) Brewton told Waite that the Cialis items were not a big deal, (3) Waite admitted that he had Cialis marketing materials in his office, (4) Brewton's investigation recorded information about Isbell's coworkers own complaints about Isbell, (5) Brewton found Isbell credible, and (6) Waite was now a "two-time offender." (Pl.'s Resp. 3, 10.)

Isbell's only support for her contention that Brewton did not follow procedures is that she did not interview all the people Isbell identified as people Brewton should interview. Brewton testified that she concluded from Isbell's interview that these people would not have relevant information, and Isbell has no evidence indicating that this determination actually violated Baxter

policy. Brewton did not testify that she ignored Isbell's statement, which would have violated policy, but that she concluded that the purported witnesses were not relevant.

Next, Brewton learned in her interview with Waite that he had Cialis marketing materials in his office; Brewton looked at those materials and told Waite that they were "not a big deal." This hardly demonstrates that Brewton's investigation was a sham. Brewton reached the same conclusion as the court: the Cialis marketing materials may have been distasteful to Isbell, but they do not constitute harassment because of Isbell's gender. Brewton reached this conclusion after she looked at the materials themselves—in other words, after investigating.

Similarly, Brewton's determination that some of Isbell's coworkers had complained about her work does not show that her investigation was a sham. That Brewton would interview Isbell's coworkers is unsurprising, and the record does not show whether Brewton solicited this information or the coworkers volunteered it. Brewton's conclusions simply echo the complaints about Isbell that Gawin already knew about. There is no basis for a finding that Brewton recorded these complaints as part of a scheme to resurrect negative attitudes toward Isbell in retaliation for her complaints concerning Waite.

Isbell is also skeptical that Brewton could find Isbell credible, yet still conclude that her grievance lacked merit. In fact, Brewton explained that she found Isbell "credible in the sense that she believed what was she was saying" (Brewton Dep. 104:21–105:9); she nevertheless determined that Isbell's grievance was based on misinterpretation. This also simply echoes the court's conclusion: Isbell had a subjective belief that she experienced sexual harassment, but that belief was not reasonable. As the court explained above, mere subjective belief is not enough to convert Cialis marketing materials and discussions into disparagement of women, nor will it transform two isolated, albeit inappropriate, jokes into conduct that is pervasive enough to be harassment.

Isbell contends that Baxter's investigation was a sham because Baxter refused to discipline Waite even though he was a "two-time offender." There are two problems with this

argument. First, Isbell does not point to any evidence that Baxter even knew of the accusation against Waite at Eli Lilly. Second, Brewton concluded that the purported "second offense" did not have merit, so there was no reason for Baxter to discipline Waite.

Finally, Isbell offers no basis for finding a link between Brewton's investigation and Gawin's motivation for terminating Isbell. In *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994), the plaintiff argued that an investigation was a sham because his superior questioned only a small number of his coworkers. But the court found that his challenge was

> directed towards the wisdom of [the superior's] actions, not the factual basis for his decision. [The plaintiff's superior] did not survey [two particular coworkers], but if [the superior] consults with only a few key people and concludes that [the plaintiff] must be fired, that is enough. He is also entitled to the assumption that those people he did consult were telling the truth.

*Id.* Brewton's investigation was no more flawed than that in *Rand*, and more importantly, it does not call into question Gawin's motivation for terminating Isbell.

## CONCLUSION

Isbell's complaints are not protected activity. It is not even clear that Gawin was aware of them when she made the discharge decision, which was amply supported by complaints from co-workers about Gawin's job performance. The court finds no disputes of material fact on these issues. Defendant's motion for summary judgment [22] is granted.

ENTER:

Dated: March 31, 2017

_____
REBECCA R. PALLMEYER
United States District Judge